IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JESSE T.,[1]

        Plaintiff,

v.                    Case No. 2:22-cv-101

KILOLO KIJAKAZI,
Acting Commissioner of
Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Jesse T. ("Plaintiff") seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") under the Social Security Act. Plaintiff presents two errors for review. First, he alleges that the Commissioner's administrative law judge ("ALJ") determined his mental residual functioning capacity ("RFC") without properly evaluating the opinion of Plaintiff's treating psychologist, Errol Liebowitz, PhD SEP. As a result, Plaintiff argues that the ALJ's mental RFC determination is not supported by substantial evidence. Plaintiff also alleges that the ALJ rejected all opinion evidence of record as to Plaintiff's physical functioning, resulting in a

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

physical RFC that is not supported by substantial evidence.  This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report finds no error in the ALJ's assessment of the evidence and therefore recommends that the court grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner.

## I.   PROCEDURAL BACKGROUND

On October 21, 2019, Plaintiff filed for DIB based on physical and mental impairments beginning on November 8, 2018, that he claimed rendered him unable to work.  (R. 185-96).  On June 9, 2020, the Commissioner initially rejected his application.  (R. 66-77).  On August 18, 2020, the Commissioner rejected his application on reconsideration.  (R. 78-96).  Plaintiff then requested an administrative hearing.  (R. 123-24).  The hearing was held on March 9, 2021, in front of ALJ Wanda L. Wright ("the ALJ").  (R. 33).  At the hearing, counsel represented Plaintiff, and an impartial vocational expert ("VE") testified.  Id.

On May 25, 2021, the ALJ denied Plaintiff's claims for DIB, concluding that despite Plaintiff's impairments, he retained both the mental and physical RFC to perform a range of work with certain limitations to account for these impairments.  (R. 12-27).  On

January 6, 2021, the Appeals Council denied Plaintiff's request for review.  (R. 1).

Plaintiff filed his complaint in this Court on March 8, 2022, claiming that the ALJ's determination is not supported by substantial evidence.  Compl. ¶ 8 (ECF No. 1, at 2).  He moved for summary judgment on June 24, 2022, (ECF No. 13), requesting that the Court vacate the final agency decision and remand the matter for further administrative proceedings.  Pl.'s Mem. Supp. Social Security Appeal ("Pl.'s Mem.") (ECF No. 14, at 19).  Plaintiff argues that the ALJ failed to properly evaluate the opinion evidence relating to his mental health provided by Dr. Liebowitz.  Id. at 9-16.  Plaintiff also claims that the ALJ rejected all opinion evidence relating to Plaintiff's physical capabilities and failed to develop the record with a consultative examination, neglecting to build a narrative bridge between her RFC finding and the medical evidence.  Id. at 16-19.

On July 25, 2022, the Commissioner moved for summary judgment, (ECF No. 16), and opposed Plaintiff's motion.  Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem.") (ECF No. 17).  The Commissioner argues that the ALJ properly evaluated Dr. Liebowitz's medical opinion, adhered to the controlling regulations, and ultimately reached a conclusion supported by substantial evidence.  Id. at 19-26.  In the alternative, the Commissioner claims that any possible error in the ALJ's evaluation

3

of Dr. Liebowitz's medical opinion proved harmless, because even if the ALJ had adopted Dr. Liebowitz's opinion in full, the result would remain the same.  Id. at 26-27.  The Commissioner also claims that substantial evidence supports the ALJ's physical RFC determination.  Id. at 27-29.  On August 11, 2022, Plaintiff replied.  Pl.'s Reply Def.'s Mem. ("Pl.'s Reply") (ECF No. 18).  After a review of the record, this Report considers each of these arguments.

## II.  FACTUAL BACKGROUND

Plaintiff was born on August 9, 1978, and was 42 years old when the ALJ denied benefits.  (R. 25).  He meets the insured status requirements under the Social Security Act until December 31, 2023.  (R. 14).  He has not engaged in substantial gainful activity since November 8, 2018, the alleged onset date.  Id.  He has at least a high school education, and formerly worked as a truck driver.  (R. 25).  Plaintiff ceased working as a truck driver following a motor vehicle accident that occurred while on the job on the alleged onset date.  (R. 39, 229).

## A.  Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of his medical history as he disputes only the ALJ's assessment of Dr. Liebowitz's medical opinion and the RFC determination.  See Pl.'s Mem. (ECF No. 14, at 1).  The records relevant to these evaluations are summarized below.

4

1.   **Physical Treatment**

Plaintiff received treatment at the hospital immediately following his November 2018 accident. (R. 312-27). He complained of back and head pain, (R. 312), and diagnostic imaging at the hospital showed that he had swelling in his elbow and forearm and a fracture at the base of his nose, (R. 317-18). He had no signs of fracture or dislocation of his cervical spine. (R. 319, 343). Plaintiff underwent surgery on his lip at the hospital and was discharged on the afternoon of the accident. (R. 325-27).

Weeks following the accident, Plaintiff continued to complain of pain in his back, neck, left shoulder, and right arm. See (R. 42-46). In November and December 2018, Richard Guinand, D.O., and Timothy Winkler, P.A., diagnosed Plaintiff with sprain of the lumbar and thoracic spine, degenerative disc disease in the lumbar and thoracic spine, displacement of a cervical disc, and a concussion. (R. 401, 403, 407-08). At his provider's direction, Plaintiff attended physical therapy and received steroid injections for his condition. (R. 380-84, 395, 407, 496-99). On March 29, 2019, Dr. Guinand wrote that Plaintiff was improving and that his prognosis "for returning him to his pre-accident state of health is good." (R. 381).

However, through May 2019, Plaintiff's neck pain failed to improve "despite exhausting all non-surgical treatment options." (R. 374). He continued to report pain that radiated to his left

shoulder and right hand.  (R. 373).  In the same month, Mr. Winkler and David Goss, M.D., recommended cervical spine fusion surgery. (R. 372).  In July 2019, Plaintiff sought a second opinion from Jonathan Partington, M.D., who also recommended cervical spine fusion surgery.  (R. 492-94, 509).  Plaintiff underwent cervical spine fusion surgery in September 2019.  (R. 516-20).  Plaintiff worked toward recovery post-surgery in physical therapy, and by February 2020, his neck was "doing well."  (R. 954).

Plaintiff's shoulder pain had worsened by February 2020, so Plaintiff sought treatment from Justin Griffin, M.D., and Kevin Bonner, M.D., for his elbow and shoulder pain beginning March 2020. (R. 898-903, 909-17, 923-26).  In January 2021, Dr. Bonner performed surgery on Plaintiff's left shoulder to repair a torn rotator cuff. (R. 1395-1401). Six weeks post-surgery, Plaintiff's pain proved "well controlled," and he could perform gentle exercises and begin to wean himself off of pain medication.  (R. 938-39).

   2.   **Neurological Treatment**

In December 2018, Plaintiff began visiting neurologist Rajiv Nanavaty, M.D., to follow up on the concussion he sustained from the truck driving accident.  (R. 453-56).  Plaintiff reported dizziness, short term memory loss, brain fog, and "pressure pain" in his head.  (R. 453).  Over time, Plaintiff's symptoms started "gradually getting better," (R. 448), and his psychiatric and

6

neurological test results proved normal during exams in January through September 2019.  (R. 423-24, 428-29, 434-35, 438-39, 444-45).  In February 2019, Dr. Nanavaty cleared Plaintiff to return to work for four hours per day.  (R. 436).

In March 2019, Plaintiff received a Neuropsychological Assessment as ordered by Dr. Nanavaty.  (R. 446).  On March 5, 2019, Plaintiff underwent the assessment with Scott W. Sautter, PhD, ABN.  (R. 354-58).  Plaintiff reported confusion, difficulties sleeping, headaches, and memory loss.  (R. 354).  The results of the assessment revealed that Plaintiff was "premorbidly a visual learner rather than a verbal learner, such that his visual spatial skills and memory were significantly higher than his verbal skills in memory." (R. 357).  Plaintiff demonstrated possible cognitive deficiency in information processing speed, semantic fluency, and recalling verbal memory tasks immediately with rehearsal and after a delay.  Id.  He scored within the superior range for line orientation, visual discrimination, and simple judgment in daily decision-making.  Id.  Results revealed that Plaintiff experienced pain affecting his psychological wellbeing, with Dr. Sautter drawing attention to the importance of targeting aggravating symptoms of sleep disturbance, pain complaints, and depression to improve his cognitive compensatory function.  Id.  Dr. Sautter estimated that his pre-accident test performance fell within the thirteenth percentile, suggesting that any possible impairment

would be between the second and first percentile.  Id.  Overall, Dr. Sautter diagnosed Plaintiff with mild cognitive impairment, with pain, sleep, and depression symptoms aggravating his cognitive function.  Id.

On April 8, 2019, Dr. Nanavaty cleared Plaintiff to return to work once approved by his orthopedic doctors, to drive, and to complete mild, non-weight bearing exercise.  (R. 435).  During the same appointment, Dr. Nanavaty opined that Plaintiff had reached maximum medical improvement after reviewing the results from Dr. Sautter.  Id.  During a follow up appointment in August 2019, Dr. Nanavaty ordered an MRI and an EEG.  (R. 430-31).  In September 2019, Dr. Nanavaty again opined that Plaintiff had reached maximum medical improvement upon review of Plaintiff's normal MRI and EEG results.  (R. 424).  Dr. Nanavaty referred Plaintiff to clinical psychologist Dr. Liebowitz for counseling for stress related symptoms.  (R. 424-25).

In October 2019 following Plaintiff's initial psychological appointment, Dr. Liebowitz wrote a letter to Dr. Nanavaty, describing the visit, treatment plans, and diagnoses.  (R. 767-69).  Dr. Liebowitz reported that Plaintiff's psychometrics proved consistent with mild depression and minimal anxiety.  (R. 767).  Plaintiff indicated on a Perceived Stress Scale that he "felt capable of managing his current stress levels."  Id.

Dr. Liebowitz explained in the letter that Plaintiff decided to seek out psychological assistance after experiencing extreme stress and anxiety on two specific occasions. Id. The first occurred when Plaintiff could not tolerate completing an MRI, even though he had successfully completed MRIs prior to his accident. Id. The second occurred when he became agitated inside of a car wash because the brushes obscured his view. Id. Upon examination, Dr. Liebowitz reported that Plaintiff "made the same basic hand movements as he described his experiences in the MRI and during the car wash." (R. 767-68). This behavior led Dr. Liebowitz to believe that Plaintiff had experienced flashbacks. (R. 768). Plaintiff reported other symptoms consistent with Post-Traumatic Stress Disorder ("PTSD") despite failing to meet the criteria for PTSD in psychometric measures. (R. 767-68). These symptoms included anxiety while driving or riding in a vehicle, psychological and physiological responses to symbolic representations of the accident, and night terrors. Id.

Dr. Liebowitz diagnosed Plaintiff with PTSD and recommended a course of psychotherapy. (R. 768-69). He declared Plaintiff "temporarily totally disabled" from a psychological perspective but estimated that Plaintiff will "be at maximum medical improvement . . . in approximately six months." (R. 769). Dr. Liebowitz suggested that returning to work as a truck driver was unlikely for Plaintiff but that he would be able to "return to

work in some other capacity," emphasizing "the value of returning to work in some capacity from a psychological perspective." Id.

Plaintiff regularly visited Dr. Liebowitz between October 2019 and at least February 2021. (R. 766-818, 862-94, 1178-1236, 1244-1373). They continued to work to improve traumatic influences on Plaintiff's lower back pain and began to see improvement. (R. 774). Initially, he continued to experience flashbacks during the sessions. (R. 773-74). However, only a month after the initial visit, Dr. Liebowitz noted that Plaintiff "appears to be having an excellent response to treatment. Prognosis remains excellent." (R. 778). In February 2020, Dr. Liebowitz recommended that Plaintiff begin to participate in Dr. Liebowitz's PTSD group every other week. (R. 794).

Plaintiff continued to progress throughout 2020. (R. 766-818, 862-94). In June, Dr. Liebowitz reported that Plaintiff had been "surprised to discover that by doing the small mindful movements, he was able to engage in activities he had not been able to do for several months without experiencing pain." (R. 872). In July 2020, Dr. Liebowitz again expressed his hope that "with a combination of medical and psychological interventions we will achieve maximum impact on his complex of symptoms." (R. 875). In October 2020, Dr. Liebowitz wrote about his intent to cut "back on individual sessions and begin[] to alternate between individual and group psychotherapy." (R. 1188). The same month, Dr.

10

Liebowitz observed that Plaintiff "still is easily moved beyond his capacity to manage his emotions. He relies on psychotherapy to help him with this process." (R. 1190).

Significantly, in November 2020, Dr. Liebowitz determined that Plaintiff "is now able to converse with medical professionals about his accident and his injuries . . . without going into flashback[s] and dissociation. This shift is a major transition on his part." (R. 1196). In December 2020, Plaintiff continued to improve, with Dr. Liebowitz noting that he "was able to process the accident to the greatest extent that he has been able to since starting treatment . . . he has made tremendous progress." (R. 1200-01). In January 2021, Dr. Liebowitz reduced Plaintiff's therapy sessions to every other week, alternating between individual sessions and group sessions. (R. 1207).

**B.   Opinion Testimony**

> **1.   Opinion Testimony Relating to Plaintiff's Physical Condition**

On March 6, 2019, Dr. Guinand noted that "[f]rom an Ortho-Spine standpoint he will remain [n]o [d]uty until his next appointment." (R. 385). On February 17, 2021, Dr. Bonner completed a medical source statement based on Plaintiff's shoulder surgery. (R. 943-45). Dr. Bonner indicated that Plaintiff still experienced post-surgery pain in his right shoulder, and that he still required pain medication, the use of a sling, and physical

therapy.   (R. 943).   Dr. Bonner opined that Plaintiff could not return to work at this point in his recovery, and that his return-to-work status would be reevaluated at his next appointment on April 8, 2021.  (R. 944-45).  No such report appears in the record.

### 2.   Opinion Testimony Relating to Plaintiff's Neurological Condition

On February 27, 2019, Dr. Nanavaty opined that Plaintiff could return to work for four hours daily without driving involved.  (R. 436).   Another note from Dr. Nanavaty in April 2019 cleared Plaintiff to return to work, to drive, and to complete mild, non-weight bearing exercise once cleared by his "spine doctors."  (R. 435).  On the same day, Dr. Nanavaty opined that Plaintiff had reached maximum medical improvement.  Id.

In October 2019, Dr. Liebowitz opined that Plaintiff will reach maximum medical improvement in "approximately six months." (R. 769).  He also opined that Plaintiff would be able to "return to work in some other capacity," realizing "the value of returning to work in some capacity from a psychological perspective."  Id. On February 26, 2021, Dr. Liebowitz provided a letter to Plaintiff's counsel in lieu of a medical source statement.  (R. 1239).   Dr. Liebowitz concluded that Plaintiff "has made substantial progress since starting psychotherapy but I do not believe that he is capable of returning to work secondary to flare-ups that will impact his ability to maintain himself at work

12

reliably." Id. Dr. Liebowitz reached this conclusion because of Plaintiff's PTSD and posttraumatic headaches, which can "flare up unpredictably and would likely increase in frequency and intensity secondary to the stress of returning to work." (R. 1239-40). His PTSD causes Plaintiff to be "especially sensitive to sounds of metal objects contacting each other," which may trigger flashbacks and provoke painful memories. (R. 1239). Ultimately, Dr. Liebowitz explained that even if Plaintiff is deemed physically capable of returning to work "as a truck driver, he would not be capable of doing so psychologically at this time, and probably ever. His potential over-reactivity secondary to his PTSD would make him a hazard on the road." (R. 1240).

### 3.   Opinion Testimony from State Agency Consultants

On June 8, 2020, state agency medical consultant Melvin L. Clayton, M.D. initially evaluated Plaintiff's physical condition. (R. 69-72). He opined that Plaintiff has exertional, environmental, and manipulative limitations, including reaching overhead on his left side, pushing and pulling with his left arm, and avoidance of concentrated exposure to noise and hazards. (R. 69-71).

On June 8, 2020, state agency medical consultant Keith O. Noles, PhD initially completed Plaintiff's mental RFC. (R. 72-75). He opined that Plaintiff is moderately limited in the ability to understand and remember detailed instructions, but had no

13

obvious deficits in his ability to understand and follow simple instructions, meaning that Plaintiff's mental impairments "are not so severe as to impair [Plaintiff's] ability to understand and follow instructions for work related tasks." (R. 72). Dr. Noles opined that Plaintiff has moderate limitations in his ability to carry out detailed instructions and his ability to maintain attention and concentration for extended periods. (R. 72-73). He also opined that Plaintiff "demonstrates the ability to carry out at least simple tasks at low production pace with a reasonable number and length of rest periods." (R. 73). Dr. Noles further opined that Plaintiff is "able to maintain adequate relationships with co-workers . . . with minimal social interaction requirements and only casual public contact." Id. Finally, Dr. Noles opined that Plaintiff's ability to respond appropriately to change in the work setting is moderately limited, and that his "ability to tolerate stress and the pressure of work may be diminished slightly, but [Plaintiff] should be capable of adapting to relatively minor changes in an otherwise routine and stable work setting." (R. 73-74).

On reconsideration on August 14, 2020, state agency medical consultant Abraham Colb, M.D., made similar findings as Dr. Clayton for Plaintiff's physical limitations. (R. 88-90). He opined that Plaintiff occasionally experienced postural limitations and that Plaintiff experienced limited ability bilaterally in overhead

reaching above 90 degrees. (R. 88-89). Dr. Colb also opined that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, noise, vibration, and hazards. (R. 89-90).

State agency medical consultant Therese Harris, PhD, completed Plaintiff's mental RFC on reconsideration on August 13, 2020. (R. 90-93). She opined that contrary to Dr. Noles' opinion on Plaintiff's ability to understand and remember detailed instructions, "[n]o objective evidence of significant limitations in this area" existed, and that "[r]ecent evidence states normal memory." (R. 90-91). Dr. Harris' evaluation of Plaintiff's sustained concentration and persistence limitations proved identical to that of Dr. Noles, except for her narrative explanation that Plaintiff "remains able to maintain focus, pace and persistence for simple tasks for 2-hour periods over an 8-hour workday within a normal 40-hour workweek." (R. 91). Her evaluation of Plaintiff's social interaction limitations also tracked those of Dr. Noles; Dr. Harris indicated that Plaintiff "remains able to interact in limited capacity with the public, manage appropriate superficial interpersonal interactions in the workplace, and accept reasonable supervision." (R. 91-92). Dr. Harris also opined that Plaintiff's ability to adapt to changes in the work setting was moderately limited. (R. 92).

## C.   Adult Function Report

On November 24, 2019, Plaintiff completed an adult function report. (R. 241-48). Plaintiff reported limited use of both arms, nightmares, flashbacks, and daily anxiety as conditions that limited his ability to work. (R. 241). He indicated that he completes personal care tasks including dressing, bathing, and shaving, but that these activities are painful. (R. 242). He wrote that he does laundry about once a week but no other household chores because it causes too much pain. (R. 243-44). He can no longer participate in his old hobbies, and he reported that his social activity is limited to talking with his family and attending doctor's appointments. (R. 245).

## D.   Testimony Before the ALJ

Plaintiff's attorney and the ALJ questioned him at the hearing on March 9, 2021. (R. 40-54). The ALJ also heard testimony from the VE, Mark Tasso. (R. 54-60).

### 1.   Plaintiff's Testimony

Plaintiff testified that he lives with his fiancé and his father. (R. 40). He has a driver's license, (R. 42), and can drive short distances, and he indicated that he drove himself to physical therapy on the morning of the hearing, (R. 49). He testified that he could lift and carry up to three pounds in his right hand, but no weight in his left hand. (R. 51-52). He also

reported that he could continuously stand[2] for ten minutes and continuously walk for five to seven minutes. (R. 52). He also indicated that his daily pain level with medication typically remains at a level six on a scale from one to ten. Id. Plaintiff indicated that he had trouble sitting for long periods of time, estimating that he could sit for ten to fifteen minutes before readjusting or laying down. (R. 44). Plaintiff explained that he did not think he could complete a job that included sitting behind a desk, filing papers, and completing other clerical tasks, nor complete a job where he could sit or stand every few minutes and fold laundry, because of his physical pain. (R. 52-53).

## 2.   Testimony from the VE

The ALJ's hypothetical for the VE posited a person who works at a light exertion level with the same age, educational background, and work experience as Plaintiff, who:

> [C]an stand and/or walk for six hours out of an eight-hour workday and can sit for up to six hours our of an eight-hour workday[;] . . . can lift and/or carry up to 10 pounds frequently and 20 pounds occasionally[;] . . . can occasionally reach overhead with the bilateral upper extremities[;] . . . [never] have very concentrated exposure to extreme heat, extreme cold, avoid

---

[2] The question asked of Plaintiff appears in the record as: "And how long do you think you can stay in continuously?" (R. 52) (emphasis added). As indicated above, Plaintiff responded "10 minutes." (R. 52). This Court believes this to be a typographical error in the record since the line of questioning more closely aligns with the Plaintiff's ability to complete physical tasks. The question immediately succeeding asks Plaintiff whether he can walk continuously, and for how long, suggesting that the actual question asked referred to his ability to "stand," not "stay in."

concentrated exposure to vibration and loud
noise[;] . . . can occasionally balance, stoop, kneel,
crouch, or crawl, occasionally climb ramps or stairs.
Never climb ladders, ropes or scaffolds[;] . . . should
avoid all exposure to moving machinery, hazardous
machinery and unprotected heights[;] can understand,
remember and carry out instructions that are consistent
with a reasoning level of 2 or 3[;] . . . can sustain
concentration and continue pace sufficient enough to
carry out those instructions over the course of an eight-
hour workday at two-hour intervals[;] . . . can work in
low-stress setting which is typically defined to mean no
fast-paced production, only simple work-related
decisions and few or no changes in the work setting.

(R. 55-56).

The VE testified that the hypothetical individual would be
unable to return to Plaintiff's previous work as a tractor trailer
truck driver. (R. 56). However, the VE identified three jobs
available in the labor market with these limitations: (1) laundry
sorter (361.687-014) with 34,000 jobs nationally, (2) delivery
router (232.587-038) with 35,000 jobs nationally, and (3) folder
(369.687-018) with 39,000 jobs nationally. Id. The VE testified
that the hypothetical individual could still perform all three
jobs listed with the additional factor that the individual could
frequently handle and finger bilaterally. (R. 56-57). The ALJ
then added hypothetical limitations to "sedentary exertion and
that the individual can stand and/or walk two hours in an eight-
hour workday and lift and/or carry up to 10 pounds occasionally."
(R. 57). The VE identified three additional jobs available in the
economy: (1) lens inserter (713.687-026) with 90,000 jobs

18

nationally, (2) addresser (209.587-010) with 101,000 jobs nationally, and (3) stuffer (731.687-014) with 138,000 jobs nationally. Id. The VE testified that those three jobs could also be performed with the addition of frequent bilateral handling and fingering. (R. 57-58). The final two hypothetical additions the ALJ posed assumed that the individual would be off task five percent of the day, then fifteen percent of the workday. Id. The VE testified that spending five percent of the workday off task would not alter the individual's ability to complete any of the six jobs identified, however, that fifteen percent would preclude the individual from work. Id.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat

less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  ANALYSIS

Plaintiff's brief identifies two errors he claims warrant remand.  He claims that the ALJ's mental RFC finding is not supported by substantial evidence because she failed to properly evaluate Dr. Liebowitz's opinion.  In addition, he claims that the ALJ erred by totally rejecting all opinion evidence of record, failing to develop the record with a physical consultative

20

examination, and failing to build a narrative bridge between the RFC and the record.  As explained below, this Report finds no error in the ALJ's analysis.  Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

## A.  Framework for SSA Disability Evaluation

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d).  As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), § 416.905(a).  An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy.  See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination.  20 C.F.R. § 416.920(a)(4).

Specifically, the regulations direct the ALJ to answer the following five questions:

1.  Is the individual involved in substantial gainful activity?

2.  Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.  Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.  Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.  Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.   The ALJ Decision Currently Before the Court for Review**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (R. 14). At step two, she found that Plaintiff suffered from severe impairments.[3] The ALJ found that these impairments significantly limited his ability to perform basic work

---

[3] The ALJ found that Plaintiff suffered from "degenerative disc disease, degenerative joint disease, right elbow lateral epicondylitis with partial tear; obesity, trigeminal neuralgias, chronic pain disorder, posttraumatic stress disorder (PTSD), and mild cognitive disorder." (R. 14). The ALJ also identified "sinusitis; minimally displaced nasal fracture; lip laceration; hearing loss; headaches; hypertension; tinnitus; septal deviation; vertigo; and concussion" but explained that these impairments "were adequately controlled with medications or resolved" and deemed non-severe. (R. 14-15). Nonetheless, the ALJ "considered all of the claimant's medically determinable impairments, including those that were not severe, when assessing the claimant's residual functioning capacity." (R. 15).

activities.  Id.  At step three, the ALJ found that Plaintiff did not suffer from an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (R. 15).  The ALJ developed a finding regarding Plaintiff's mental and physical RFC.  (R. 17).  She determined Plaintiff had numerous limitations but was able to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations:

> occasional reach overhead with bilateral upper extremities; avoid concentrated exposure to extreme heat, extreme cold, avoid concentrated exposure to vibration and loud noise; occasionally balance, stoop, kneel, crouch, or crawl; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; avoid all exposure to unprotected heights, moving machinery, and hazardous machinery; can understand, remember, and carry out instructions that is consistent with a reasoning level of "two" or "three" as defined in the Dictionary of Occupational Titles; can sustain concentration, attention, and pace sufficient enough to carry out those instructions over the course of an 8-hour workday and at two hour intervals; can work in proximity to, but not [in] coordination with co-workers and supervisors; can only have superficial contact with the public; can work in a low stress setting, which is specifically defined to mean no fast paced production, only simple work related decisions, and few or no changes in the work setting; and due to chronic pain, he would be off task no greater than 5% of the time in an 8-hour workday, in addition to normal breaks (with normal breaks defined as a 15 minute morning and afternoon break and a 30 minute lunch break.)

(R. 17-18).  At step four, the ALJ determined that Plaintiff proved unable to perform any relevant past work, adopting the VE's testimony that the demands of Plaintiff's past work as a truck

driver exceeded his RFC.  (R. 25).  At step five, the ALJ ultimately found that Plaintiff was not disabled because "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." Id.

## C.   The ALJ's Evaluation of the Medical Opinions Regarding Plaintiff's Mental RFC is Supported by Substantial Evidence

Plaintiff argues that substantial evidence did not support the ALJ's mental RFC determination or the ALJ's finding that Dr. Liebowitz's opinion proved unpersuasive.  Specifically, Plaintiff asserts that the ALJ failed to provide a legally sufficient explanation for rejecting Dr. Liebowitz's opinion evidence.  See Pl.'s Mem. (ECF No. 14, at 11) (citing R. 24).  The Commissioner observed that the ALJ followed the new regulations for evaluating medical opinion testimony and explained that the ALJ articulated several reasons as to why she found Dr. Liebowitz's opinion unpersuasive.  See Def.'s Mem. (ECF No. 17, at 19-20).  Because the ALJ's evaluation of Dr. Liebowitz's opinion evidence comports with the controlling regulations,[4] remand is not appropriate.

---

[4] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings.  20 C.F.R. § 404.1520c.  The new rules apply to all claims filed after March 27, 2017.  Id.  Because Plaintiff filed his claim on October 10, 2019, (R. 61), the new rules apply.

The ALJ found Dr. Liebowitz's assertions contained in his letter of February 26, 2021 "not persuasive," providing several reasons as to why she found the letter unpersuasive.   (R. 24). First, the ALJ reasoned that Dr. Liebowitz's statements were "vague," because his letter was "not stated in vocationally relevant terms, meaning they do not indicate what the claimant can do despite his impairments." Id. ALJs must abide by 20 C.F.R. § 404.1520b when reviewing evidence relevant to a claim.   Some statements in the record are inherently neither valuable nor persuasive because they are on issues reserved to the Commissioner, which are identified in 20 C.F.R. § 404.1520b(c)(3)(i)-(viii).

Relevant to this analysis, statements of disability, including statements that one is or is not able to work, or statements about a claimant's RFC that use programmatic terms describing functional exertion levels, cannot be considered by the ALJ.   See 20 C.F.R. §§ 404.1520b(c)(3)(i), 404.1520b(c)(3)(v). Conclusory statements of disability are distinct from statements indicating what an individual can or cannot do despite his impairments, including an individual's ability to understand, remember, concentrate, persist, adapt, or interact with others in the workplace. See id. Dr. Liebowitz's letter stated: "I do not believe that he is capable of returning to work secondary to flare-ups that will impact his ability to maintain himself at work reliably." (R. 24, 1239). The opinion "unable to work" and—to a

lesser extent—conclusions regarding Plaintiff's "ability to maintain himself at work reliably" serve as statements of disability because they do not reveal how Plaintiff's physical or mental limitations would impact his ability to function at work. Id. The regulations prohibit an ALJ from considering any statement specific to Plaintiff's RFC and capacity to work; therefore, the ALJ's conclusion that Dr. Liebowitz's statement was unpersuasive due to its lack of precision and failure to describe vocationally relevant limitations complied with SSA rules. See (R. 24).

Second, the ALJ explained that Dr. Liebowitz improperly opined on Plaintiff's ability to perform his past work as a truck driver, "which is a matter reserved to the Commissioner, and, [is] further deserving of no consideration." Id. Statements about whether an individual's RFC prevents them from completing past relevant work relate to an issue reserved to the Commissioner, and therefore, that evidence is neither valuable nor persuasive. See 20 C.F.R. § 404.1520b(c)(3)(iv). Dr. Liebowitz ended his letter by explaining that "Even if after completion of Mr. Tranquillo's medical interventions he is deemed physically capable of returning to work *as a truck driver*, he would not be capable of doing so . . . ." (R. 1240) (emphasis added). This statement suggests that Dr. Liebowitz's letter addressed Plaintiff's ability to return to past relevant work. See 20 C.F.R. § 404.1520b(c)(3)(iv). The ALJ correctly gave this aspect of the letter no consideration.

Third, the ALJ explained that Dr. Liebowitz's opinion was unsupported by objective medical evidence from his own treating notes. (R. 24). Plaintiff argues that the ALJ did not properly address the factors of supportability and consistency because she failed to show "how that evidence was inconsistent with the opinion," and that "the reader is left to guess as to which records the ALJ believed [were] inconsistent." Pl.'s Mem. (ECF No. 14, at 13). To the extent she was required, notwithstanding the statements that the regulations forbid the ALJ from considering, she properly considered and applied the factors of supportability and consistency to Dr. Liebowitz's opinion.

Under the rules in effect for Plaintiff's claim, the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). The regulations do not require the ALJ to make detailed findings on evidence she finds neither valuable nor persuasive, id., nor do they require her to provide an explanation in a particular format if the decision reveals a "coherent basis"

for her fact-finding, Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018).

The supportability analysis serves as an internal check that weighs the objective medical evidence and supporting explanations that come from the source itself. See § 404.1520c(c)(1); Bright v. Saul, 2020 WL 4483008, at *3 (M.D.N.C. Aug. 4, 2020). When the ALJ considered the objective evidence available in this record, she properly found Dr. Liebowitz's letter and opinion evidence unpersuasive because "the treating notes generally show 'substantial progress' and not many objective findings." (R. 24). Contrary to Dr. Liebowitz's opinion that Plaintiff could not return to work, the lengthy record of treating notes detailing these subjective judgments are generally positive, with treatment notes describing Plaintiff's excellent prognosis and response to treatment, (R. 778), and the fact that Plaintiff could talk about his accident without going into flashbacks or dissociation, (R. 1196); see also (R. 769, 773-74, 794, 872-75, 1188, 1190, 1200, 1207). The final treatment note from individual therapy sessions reduced Plaintiff's "individual treatment to every other week" beginning in January 2021. (R. 1207). As the ALJ properly identified, these judgments by the opining physician reveal a pattern of improvement which does not support the restrictive limitations described in the letter. See id.

The ALJ properly identified the objective evidence provided by Dr. Liebowitz, discussing Plaintiff's intake psychometrics, his response on the Perceived Stress Scale, and even the fact that Plaintiff did not meet all the criteria for PTSD, but that Dr. Liebowitz felt he experienced more symptomology than indicated. (R. 22) (citing Exs. 8F, 13F, 19F, and 20F). The ALJ reasonably found Dr. Liebowitz's opinion that Plaintiff continued to suffer debilitating mental health symptoms as of February 2021 unpersuasive against the backdrop of the objective evidence and judgments in the record from his own treatment.

Plaintiff also claims that Dr. Liebowitz's opinion is consistent with the overall record, namely Dr. Sautter's psychological assessment. Pl.'s Mem. (ECF No. 14, at 15). The ALJ summarized Dr. Sautter's objective evidence at length prior to evaluating Dr. Liebowitz's opinion. (R. 21-22). As the ALJ's opinion indicated, Dr. Sautter diagnosed Plaintiff with mild cognitive impairment, with pain, sleep, depression, and concussion-like symptoms aggravating his cognitive function. (R. 22, 357). The ALJ pointed out that Plaintiff "tended to give up too easily on memory tests," which influenced the test results. (R. 22) (citing Ex. 2F). Most significantly, Dr. Sautter found that Plaintiff's pre-accident test performance fell within the thirteenth percentile, suggesting that any possible impairment would be between the second and first percentile. Id. This

objective evidence from Dr. Sautter is inconsistent with Dr. Liebowitz's opinion, especially since Dr. Sautter did not diagnose Plaintiff with PTSD at all.  Compare (R. 357) with (R. 1239-40).

Because the ALJ provided a legally sufficient analysis of both supportability and consistency in rejecting Dr. Liebowitz's opinion evidence, substantial evidence supports the ALJ's assessment, and Plaintiff's mental RFC is supported by substantial evidence.  See 42 U.S.C. § 405(g); Biestok v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

**D.   The ALJ's Evaluation of the Medical Opinions Regarding Plaintiff's Physical RFC is Supported by Substantial Evidence**

Plaintiff also argues that the ALJ based her physical RFC findings on her own interpretation "of the raw medical data, thus improperly 'playing doctor' and inventing a physical RFC out of whole cloth."  Pl.'s Mem. (ECF No. 14, at 17).  Plaintiff also claims that the ALJ did not adequately develop the record with the opinion of a consultative examiner, failing to create a narrative bridge between the evidence and the RFC.  Id. at 18-19.  The Commissioner contends that the ALJ did not reject all of the opinion evidence because the ALJ found the opinions of the state agency medical consultants persuasive.  Def.'s Mem. (ECF No. 17, at 27-28).  Because the ALJ did not substitute her own opinion for the medical evidence or fail to develop the record, remand is not appropriate.

In Lewis v. Berryhill, the Fourth Circuit determined that the ALJ in that case improperly "played doctor" by mischaracterizing treatment as "conservative." 858 F.3d 858, 869 (4th Cir. 2017). Plaintiff claims that the ALJ acted similarly by "reject[ing] all evidence of record pertaining to Plaintiff's physical health," therefore having no medical provider to guide her decision and requiring her to "play doctor." Pl.'s Mem. (ECF No. 14, at 17). In Lewis, however, the court did not criticize the ALJ for crediting agency medical opinions over those of the medical provider. See 858 F.3d at 869. Instead, the opinion mischaracterized claimant's extensive treatment. See id. In this case, the ALJ's rejection of certain evidence in favor of other evidence does not mischaracterize the record. See id.

The ALJ did not reject all opinion evidence of record, nor did she "play doctor." For example, she found the opinion evidence of Dr. Colb persuasive because it was "mostly consistent with physical exams and reports from claimant's treating sources." (R. 24). She found Dr. Clayton's findings "less persuasive" because they did not reflect Plaintiff's true functional capacity compared to Dr. Colb's analysis, and "greater postural and environmental limitations were deemed necessary to better account for claimant's back pain and reports of instability." Id. Fully adopting Dr. Colb's opinion ultimately benefitted Plaintiff, providing more limitations to better account for his impairments.

Plaintiff also takes issue with the fact that the ALJ considered the opinions of Dr. Bonner and Dr. Nanavaty unpersuasive. Pl.'s Mem. (ECF No. 14, at 18). The ALJ found Dr. Bonner's testimony unpersuasive because "Dr. Bonner did not indicate how much the claimant could stand, walk, [or] sit" and fails "to cite to the record to support his conclusory opinions." (R. 23). Dr. Bonner submitted a vague medical source statement. (R. 943-45). He indicated that Plaintiff's "left shoulder is still painful post-surgery," summarized Plaintiff's impairments, and checked the "no" box when prompted whether the patient would be able to work full time as of February 17, 2021. (R. 943-44). But Dr. Bonner left the rest of the medical source statement blank. (R. 943-45). He described no specific objective limitations that would account for his opinion, despite being prompted to do so by the text of the form. Id. Whether or not an individual can work is an issue left to the Commissioner, and Dr. Bonner's conclusory statement regarding Plaintiff's ability to work, without more, has little probative value. 20 C.F.R. §404.1520b(c)(3)(i).

The record also supports the ALJ's conclusion regarding the transitory nature of Dr. Bonner's statements. Plaintiff's medical records from six weeks post-surgery with Dr. Bonner suggest that Plaintiff's post-surgery pain had improved, but that "it's really too early to know what his long-term disability will be. He obviously has limitations right now." (R. 939). The ALJ properly

observed that "consistent with his medical notes, this was a temporary only restriction, intended to apply only until that period of time in April 2021 and was not intended to describe the claimant's permanent and ongoing condition." (R. 23). The ALJ found Dr. Nanavaty's opinion unpersuasive for similar reasons as Dr. Bonner's opinion; Dr. Nanavaty's opinions on when Plaintiff could return to work, without an explanation as to why, serves little value. See Eric E. v. Comm'r of Soc. Sec., No. 2:21-cv-00398-AWA-DEM, 2022 WL 1574221, at *14 (E.D. Va. Mar. 11, 2022), R. & R. adopted by Eric E. v. Kijakazi, 2022 WL 4137835 (E.D. Va. Sept. 12, 2022); 20 C.F.R. § 404.1520b(c)(3)(i).

1. **The ALJ Properly Developed the Record.**

Plaintiff also cites Cook v. Heckler to argue that the ALJ failed to properly develop the record by not seeking out a consultative examination to fill in the "evidentiary gap created by the ALJ's treatment of all other opinions of record as to Plaintiff's physical functioning." Pl.'s Mem. (ECF No. 14, at 18-19); see 783 F.2d 1168, 1173 (4th Cir. 1986). But in Cook, the record contained almost no evidence, lacking "tests and physician's opinions" so that it was "impossible for the ALJ to tell whether she did or did not" meet the requirements for an impairment. 783 F.2d at 1176. The record here is voluminous and contains ample evidence on which to render a decision.

In addition to the opinions the ALJ found persuasive, the voluminous 1400-page record certainly "contained sufficient medical evidence for the ALJ to make an informed decision regarding the claimant's impairment." Lehman v. Astrue, 931 F. Supp. 2d 682, 692-93 (D. Md. 2013) (quoting Craft v. Apfel, 164 F.3d 624, 1998 WL 702296, at *3 (4th Cir. Oct. 6, 1998) (unpublished table opinion)) (cleaned up). An RFC "is an administrative assessment made by the [ALJ] based on all the relevant evidence in the case record." Felton-Miller v. Astrue, 459 F. App'x 226, 230-31 (4th Cir. 2011). The ALJ had sufficient evidence in the record to determine Plaintiff's disability status; the regulations did not require her to request a consultative examination. 20 C.F.R. § 404.1520b(b)(2)(iii).

Finally, it is worth observing that the ALJ accounted for Plaintiff's limitations in a severely restrictive RFC. The RFC "is the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ developed a highly restrictive RFC, including limiting Plaintiff to avoid concentrated exposure to vibration and loud noises. See (R. 17). This targets what is one of Plaintiff's greatest limitations: exposure to certain noises that could trigger a flashback or posttraumatic headache. (R. 23); see (R. 1239) (Plaintiff is "especially sensitive to sounds of metal objects contacting each other.") The ALJ also carefully accounted for Plaintiff's physical

limitations, including limitations specific to overhead reaching and other postural limits to account for his recovering neck, left shoulder, and elbow.   (R. 22-23).   The ALJ carefully handled Plaintiff's neurological and physical difficulties, and it is clear from the highly restrictive RFC that, although Plaintiff does have limitations, the ALJ accounted for them in reaching her decision.   The VE then testified that jobs were available with this RFC.   (R. 56-57).   This was precisely what the regulations require of the ALJ, and remand is not warranted.

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 16), DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), and AFFIRM the Commissioner's finding of no disability.

## VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if

36

service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

November 21, 2022